# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### MIDDLE DIVISION

MARTHA EVERETT,         )
                                    )

     Plaintiff,          )
                                    )

v.                          )     Case No. 4:17-cv-0029-JEO
                                    )

NANCY BERRYHILL, Acting     )
Commissioner of Social Security,   )
                                    )

     Defendant.        )

## <u>MEMORANDUM OPINION</u>

Plaintiff Martha Everett brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final decision of the Acting Commissioner of Social Security ("Commissioner") denying her supplemental security income ("SSI") benefits. (Doc. 1).[1] The case has been assigned to the undersigned United States Magistrate Judge pursuant to this court's general order of reference. The parties have consented to the jurisdiction of this court for disposition of the matter. *See* 28 U.S.C. § 636(c), FED. R. CIV. P. 73(a). Upon review of the record and the relevant law, the undersigned finds that the Commissioner's decision is due to be affirmed.

---

[1]References herein to "Doc(s). __" are to the document numbers assigned by the Clerk of the Court to the pleadings, motions, and other materials in the court file, as reflected on the docket sheet in the court's Case Management/Electronic Case Files (CM/ECF) system.

# I.  PROCEDURAL HISTORY

Plaintiff filed her application for SSI benefits on November 18, 2013, alleging she became disabled beginning June 20, 2012.  It was initially denied by an administrative law judge ("ALJ") on January 21, 2016, following a hearing. (R. 20-32).[2]  The Appeals Council ("AC") denied Plaintiff's request for review. (R. 1).

# II.  BACKGROUND FACTS

Plaintiff was 41 years old at the time of the ALJ's decision.  (R. 32, 148). She previously worked as a cook, a dishwasher, and a server.  (R. 40, 166-67). She alleges disability due to migraines, arthritis, and attention deficit hyperactivity disorder ("ADHD").  (R. 170).

Following Plaintiff's hearing, the ALJ found that she had the medically determinable severe impairments of migraines, polyarthritis, ADHD, generalized anxiety disorder, acute stress disorder, and major depressive disorder.  (R. 22).  He also found that Plaintiff did not have an impairment or combination of impairments that met or equaled the severity of a listed impairment.  (R. 23).  He further found that Plaintiff had the residual functional capacity ("RFC") to

---

[2]References herein to "R. __" are to the administrative record found at Docs. 8-1 through 8-14 in the court's record.

perform light work with limitations. (R. 24). He determined that Plaintiff could not perform her past relevant work. (R. 29). He further found that based on Plaintiff's age, education, work experience, and RFC, and the testimony of a vocational expert ("VE"), Plaintiff could work as a bakery worker, linen clerk, or cleaner. (R. 31). The ALJ concluded that Plaintiff was not disabled. (R. 32).

## III. STANDARD OF REVIEW

The court's review of the Commissioner's decision is narrowly circumscribed. The function of the court is to determine whether the Commissioner's decision is supported by substantial evidence and whether proper legal standards were applied. *Richardson v. Perales*, 402 U.S. 389, 390, 91 S. Ct. 1420, 1422 (1971); *Mitchell v. Comm'r Soc. Sec.*, 771 F.3d 780, 782 (11th Cir. 2015; *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002). The court must "scrutinize the record as a whole to determine if the decision reached is reasonable and supported by substantial evidence." *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). Substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.* It is "more than a scintilla, but less than a preponderance." *Id.*

The court must uphold factual findings that are supported by substantial evidence. However, it reviews the ALJ's legal conclusions *de novo* because no

presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied. *Davis v. Shalala*, 985 F.2d 528, 531 (11th Cir. 1993). If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, it must reverse the ALJ's decision. *See Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991). The court must affirm the ALJ's decision if substantial evidence supports it, even if other evidence preponderates against the Commissioner's findings. *See Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004) (quoting *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir.1990)).

## IV. STATUTORY AND REGULATORY FRAMEWORK

To qualify for benefits a claimant must show the inability to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(a)(3)(D).

Determination of disability under the Social Security Act requires a five

step analysis. 20 C.F.R. § 416.920(a)(4). Specifically, the Commissioner must

determine in sequence:

> whether the claimant: (1) is unable to engage in substantial gainful
> activity; (2) has a severe medically determinable physical or mental
> impairment; (3) has such an impairment that meets or equals a Listing
> and meets the duration requirements; (4) can perform his past relevant
> work, in light of his residual functional capacity; and (5) can make an
> adjustment to other work, in light of his residual functional capacity,
> age, education, and work experience.

*Evans v. Comm'r of Soc. Sec.*, 551 F. App'x 521, 524 (11th Cir. 2014).[3] The

plaintiff bears the burden of proving that she was disabled within the meaning of

the Social Security Act. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir.

2005); *see also* 20 C.F.R. § 416.920(a). The applicable "regulations place a very

heavy burden on the claimant to demonstrate both a qualifying disability and an

inability to perform past relevant work." *Id*.

## V. DISCUSSION

Plaintiff asserts that the ALJ erred in that (1) he failed to properly assess the

medical opinion of treating physician Dr. Richard G. Diethelm; (2) he substituted

his opinion for that of Dr. David Wilson and treating social worker Dave Harvey;

---

[3]Unpublished opinions of the Eleventh Circuit Court of Appeals are not considered binding precedent; however, they may be cited as persuasive authority. 11th Cir. R. 36-2.

(3) he failed to find that Plaintiff met Listing 12.06; (4) he failed to state adequate reasons for finding Plaintiff not credible; (5) his decision was not based on substantial evidence; and (6) the RFC finding of an ability to perform light work is not supported by substantial evidence. (Doc. 12 at 2). The Commissioner responds that substantial evidence supports the ALJ's determinations. Each issue will be addressed below after the court provides the relevant medical evidence.[4]

### A.    Medical Evidence

On August 21, 2012, Plaintiff saw Dr. Diethelm, complaining of migraines. Plaintiff reported that she developed a headache in April 2012. It developed into "an occipital shooting headache that lasts 4 hours and is associated with light and sound sensitivity, worse with movement with nausea but no emiesis." (R. 274). She also reported that "in the last 30 days she had 15 days of headache[s] of which 4 have been so severe as to be disabling." (*Id*.) Dr. Diethelm listed a "frequency-to-severity ratio equal [to] 15:4."[5] (*Id*.) Plaintiff was diagnosed with a migraine and placed on a medication treatment plan. (R. 275). She was seen for a return

---

[4]Both parties have provided detailed statements of the facts. The court has adopted and reproduced much of the Commissioner's version simply because of its readability. Plaintiff does not challenge the Commissioner's statement of the facts. The court has also added additional facts from the record when appropriate.

[5]The term "frequency-to-severity ratio" is oftentimes used by Dr. Diethelm to refer to the number and severity of headaches during the last thirty days before a visit. Severity appears to reference migraines that the patient deems to be disabling. That term – disabling – does not appear to be defined in the record.

visit on October 22, 2012. She reported a frequency-to-severity ratio of 8:0. (R. 273). She was assessed as improving, and was directed to return in three months.

Plaintiff returned to Dr. Diethelm on April 22, 2013, with complaints of toe pain and "global headache." She reported a frequency-to-severity ratio of 15:15. (R. 272). Dr. Diethelm adjusted her medication and directed her to return in three months. (R. 273).

On July 18, 2013, Plaintiff had a return visit. Her frequency-to-severity ratio was 9:9. Dr. Diethelm again adjusted her medication and directed that she return in six months.[6] (R. 271).

On September 12, 2013, Plaintiff had an initial psychiatric evaluation with Dave Harvey, a licensed clinical social worker ("LCSW"). She complained of financial stress and constant anxiety. (R. 329). She was diagnosed with generalized chronic anxiety and acute stress disorder. (R. 331). She saw him again on October 22, 2013. Plaintiff complained at that time that she was "very

---

[6]Plaintiff also was seen at Quality of Life Health Services ("Quality") on June 7, 2013, for a followup visit concerning a sore throat. (R. 317). During that visit, she stated that she was "'stressed to the max' because of 'everything going on.'" (*Id*.) She later elaborated that she was stressed about her daughter going to play softball in a tournament in Gulf Shores and how she could be there will maintaining "behavioral health." (R. 318).

She was also seen at Quality on July 12, 2013, for anxiety. She was assessed with chronic anxiety. (R. 320-23). During the visit, Plaintiff indicated that she was thinking about going back to work. CRNP Raymond Doty state he saw no reason why she could not go back to work part time. (R. 320).

tired and feels strung out." (R. 337). She felt that her therapy sessions with Harvey were helpful, and she wanted to come monthly. (*Id*.)

On November 19, 2013, Plaintiff saw Harvey for a follow-up visit related to her mental health treatment. (R. 338-39). Plaintiff reported "doing better" and feeling "very good" about her divorce becoming final the previous week. (R. 339). She stated she was dating and went to Mississippi the previous week with her son, boyfriend, and boyfriend's son. (*Id*.) She was planning to go to Georgia with her boyfriend that day. (*Id*.). Harvey noted Plaintiff had ADHD-inattentive type that could be treated with stimulant medication, and Plaintiff said she would follow through with her neurologist that prescribed all her medications. (*Id*.) Plaintiff mentioned dealing with some issues, and she was "[u]pbeat but tense," but Harvey indicated Plaintiff's mental status was "relatively normal." (*Id*.) Harvey diagnosed Plaintiff with chronic generalized anxiety; chronic acute stress disorder; and chronic ADHD, predominately inattentive. (R. 338). When outlining Plaintiff's treatment plan, Harvey noted Plaintiff had excessive worry on a consistent basis, "motor restlessness," "distractibility of attention," memory deficits, and inability to follow complex directions. (R. 339).

Six days later, on November 25, 2013, Plaintiff saw Raymond Doty, CRNP, for a left hand issue. (R. 340-43). Plaintiff reported that she tried to hit her dog

but missed and hit a post. (R. 340). She denied psychiatric issues such as anxiety and depression. (R. 341). Doty found Plaintiff was fully oriented, had normal judgment, and demonstrated appropriate mood and affect. (R. 342).

Plaintiff saw Dr. Diethelm on January 17, 2014, for complaints related to migraines, including photosensitivity, sound sensitivity, smell sensitivity, nausea, and vomiting. (R. 434). She reported that in the last 30 days she had 24 headaches, four of which were severe enough to be debilitating–a severity ratio of 24:4. (R. 434). Dr. Diethelm found Plaintiff was alert, fully oriented, and had normal mentation. (*Id.*) She had fluent speech, her pupils were equally reactive to light, and her extra ocular muscles were intact without nystagmus. (*Id.*) Her face was symmetric to strength and sensation. (*Id.*) She had full extremities strength, intact sensation, and a steady, unstressed gait. (*Id.*) She had pain on palpitation to the bilateral occipital nerves and bilateral trapezius muscles. (*Id.*). Dr. Diethelm administered suboccipital nerve blocks and administered trapezius injections. (*Id.*) He further noted that if Plaintiff's medications were ineffective, he would consider Botox injections. (*Id.*) He diagnosed her with intractable migraines. (*Id.*)

On February 5, 2014, Plaintiff saw Harvey related to ADHD, anxiety, and chronic pain. (R. 353). Plaintiff mentioned she had severe migraines and was receiving treatment from Dr. Diethelm, including multiple shots, with little

improvement. (R. 354). Harvey noted that she tolerates the pain, "but at times these headaches are so severe she cannot get out of bed." (*Id*.) Plaintiff's diagnoses again were chronic generalized anxiety; chronic acute stress disorder; and chronic ADHD, predominately inattentive. (*Id*.)

Harvey completed a "MENTAL HEALTH SOURCE STATEMENT," provided by Plaintiff on February 10, 2014. (R. 355-56). Harvey indicated Plaintiff could understand, remember, and carry out very short and simple instructions. (R. 355). However, she could not maintain attention, concentration, or pace for at least two hours; but she could perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; accept instructions and respond appropriately to criticism from supervisors; or maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (*Id*.) In a 30 day period, Harvey stated, she would be expected to "frequently" miss work due to psychological symptoms. (*Id*.) Harvey indicated he "would say yes" to the inquiry whether her limitations existed back to January 1, 2012. (*Id*.) When asked if Plaintiff had medication side effects, Harvey stated, "none – In Constant Pain." (*Id*.)

The same day, Dr. Diethelm wrote a "To Whom It May Concern" letter

stating Plaintiff suffered from chronic migraines that were a "debilitating illness." (R. 356). Dr. Diethelm stated Plaintiff had "exquisite light and sound sensitivity, nausea, and vomiting which prevented her from doing activities requiring ... concentration or physical activity." (*Id*.) He further indicated that her conditions existed back to January 1, 2012, and would "likely continue another 12 months." (*Id*.)

In March 2014, Plaintiff saw Dr. Diethelm related to a complaint of chronic migraines. (R. 433). Plaintiff said she could not tolerate one of her migraine medications due to side effects. (*Id*.) Dr. Diethelm found she was awake, was alert without any focal motor or sensory deficits, had equal pupils, and had a steady gait. (*Id*.) He diagnosed Plaintiff with intractable migraines and noted three of her medications had been ineffective, so he submitted authorization paperwork to administer Botox injections. (*Id*.)

In April 2014, Plaintiff saw Dr. Diethelm to receive a first round of Botox injections related to her migraines. (R. 432). Dr. Diethelm found she was awake, was alert without any focal motor or sensory deficits, had equal pupils, and had a steady gait. (*Id*.) Plaintiff received her Botox injection and was told to return in six weeks. (*Id*.)

On May 21, 2014, Plaintiff saw Nurse Doty complaining of a rash. (R.

357). She denied anxiety and depression, as well as gait issues. (R. 358). She had a normal musculoskeletal examination. (R. 359). She had intact memory; was fully oriented; and had normal insight and judgment. (*Id*.) She had appropriate mood and affect. (*Id*.)

The same day, Plaintiff saw Dr. Diethelm for follow-up after receiving Botox injections. (R. 430). She reported having 25 migraines per month, with 25 of them being severe – a 25:25 ratio. (*Id*.) She reported having frontal pain that radiated to the vertex bilaterally, with light and sound sensitivity, nausea, and vomiting. (*Id*.) She said she was noncompliant with most medications and did not treat her headaches. (*Id*.) Dr. Diethelm found Plaintiff was alert, was fully oriented, and had normal mentation. (*Id*.) She had fluent speech, her pupils equally reactive to light, and her extra-ocular muscles were intact without nystagmus (*Id*.) Her face was symmetric to strength and sensation. (*Id*.) She had full extremities strength, intact sensation, and a steady, unstressed gait. (*Id*.) Dr. Diethelm noted Plaintiff had only received her first injection and was "likely to continue to improve with subsequent injections." (*Id*.) She was treated for a current migraine, and it improved before she left the clinic. (*Id*.) Dr. Diethelm adjusted her medications. (*Id*.)

In July 2014, Plaintiff filled out a questionnaire related to her Botox

injections, in which she indicated she was still having frequent headaches, that she was not receiving any relief from the Botox injections, and she was having difficulties when experiencing migraines. (R. 441-42). The same day, she saw Dr. Diethelm for her second round of Botox injections related to migraines. (R. 429). Dr. Diethelm found she was awake, was alert without any focal motor or sensory deficits, had equal pupils, and had a steady gait. (*Id*.) Plaintiff received an injection and was told to return in six weeks. (*Id*.)

In August 2014, Plaintiff returned to Dr. Diethelm for a follow-up after her second round of Botox injections related to her migraines. (R. 428). Plaintiff reported she still had about 30 migraines a month, with 10 being severe, but she did not treat them and "deals with it." (*Id*.) She reported being non-compliant with medication due to her finances. (*Id*.) Dr. Diethelm found Plaintiff was alert, was fully oriented, and had normal mentation. (*Id*.) She had fluent speech, her pupils equally reactive to light, and her extra-ocular muscles were intact without nystagmus. (*Id*.) Her face was symmetric to strength and sensation. (*Id*.) She had full extremities strength, intact sensation, and a steady, unstressed gait. (*Id*.) Dr. Diethelm noted Plaintiff was "likely to continue to improve with subsequent injections." (*Id*.) He gave her samples of medication since she could not afford them, and she "refuses to fill out patient assistance forms." (*Id*.)

In September 2014, Plaintiff saw Nurse Doty related to complaints of fatigue, constipation, and nausea. (R. 362). Nurse Doty found she had normal extremities; normal memory; and intact cranial nerves. (*Id*.) She was fully oriented; had appropriate mood and affect; normal insight; and normal judgment (R. 367).

In October 2014, Plaintiff saw Dr. Diethelm for her third round of Botox injections. (R. 427). Dr. Diethelm found Plaintiff was awake, was alert without any focal motor or sensory deficits, and had a steady gait. (*Id*.) Dr. Diethelm administered injections and stated Plaintiff should return in six weeks to assess her improvement. (*Id*.)

Later in October 2014, Plaintiff saw Nurse Doty for complaints of chronic fatigue. (R. 370). Plaintiff complained the problem is worsening and is aggravated by depression. (*Id*.) Nurse Doty found Plaintiff had normal extremities; normal memory; and intact cranial nerves. (R. 375). She was fully oriented; had appropriate mood and affect; normal insight; and normal judgment. (*Id*.)

In November 2014, Plaintiff saw Dr. Diethelm for a follow-up after her third round of Botox injections related to migraines. (R. 426). She reported her previous injection was "significantly helpful in reducing her headache severity."

(*Id*.) She stated that her headache ratio was 20:4. (*Id*.) She further reported that she "typically" did not treat her headaches with medications and, instead, would lie down for rest that provided relief. (*Id*.) She denied having a headache at that time. (R. 426). Dr. Diethelm noted Plaintiff was "non-compliant with medications secondary to pay, but [was] unwilling to fill out patient assistance." (*Id*.) Dr. Diethelm found she was alert and fully oriented, she had normal mentation, fluent speech, pupils that were equally reactive to light, and extra-ocular muscles that were intact without nystagmus. (*Id*.) Her face was symmetric to strength and sensation. (*Id*.) She had full extremities strength, intact sensation, and a steady, unstressed gait. (*Id*.) Dr. Diethelm determined to continued Plaintiff's Botox because Plaintiff "reports that it has significantly reduced her headache severity." (*Id*.)

In January 2015, Plaintiff saw Nurse Doty for complaints of swelling and sinus symptoms and to follow-up on lab tests. (R. 378). Nurse Doty found Plaintiff had normal extremities; normal memory; and intact cranial nerves. (*Id*.) She was fully oriented; had appropriate mood and affect; normal insight; and normal judgment. (R. 383).

Later in January 2015, Plaintiff saw Dr. Diethelm to receive a fourth round of Botox injections. (R. 425). Dr. Diethelm found Plaintiff was awake, was alert

without any focal motor or sensory deficits, and had a steady gait. (*Id*.) Dr. Diethelm administered the injections and stated Plaintiff should return in six weeks to assess her improvement. (R. 425).

In February 2015, Plaintiff saw Nurse Doty for complaints of a rash and anxiety. (R. 386). Nurse Doty found Plaintiff had normal extremities; normal memory; and intact cranial nerves. (R. 390). Plaintiff was fully oriented; had appropriate mood and affect; normal insight; and normal judgment. (*Id*.)

Plaintiff missed a March 2015 appointment with Harvey. (R. 479). In April 2015, Plaintiff saw Harvey and was "uptight" about her disability appeal. (R. 481). However, Harvey's observed that Plaintiff was "generally normal." (R. 482). Her appearance, build/stature, and posture were within normal limits. (*Id*.) She had average eye contact, had activity within normal limits, and was cooperative. (*Id*.) She had perception within normal limits, no hallucinations or delusions, and average intelligence. (*Id*.) She had insight within normal limits. (R. 482). Beside "judgement (sic)," Harvey wrote, "Impaired ability to make reasonable decisions: Within normal limits." (*Id*.) Harvey further noted Plaintiff had a "better mood" that day. (*Id*.)

On May 1, 2015, Plaintiff saw Dr. Diethelm to receive a fifth round of Botox injections. (R. 476). Three days later, on May 4, 2015, Plaintiff

complained during an eye examination that she was experiencing migraine headaches "almost daily." (R. 445). Later on May 26, 2015, Plaintiff saw Harvey for counseling. (R. 484-85). Examination findings were unchanged from April 2015. (*Id*.) Harvey noted Plaintiff was tense and uptight. (*Id*.) He also commented that her "severe financial instability prevents her from getting the medications/care she needs." (R. 486).

In July 2015, Plaintiff saw Dr. Diethelm for a follow-up after her fifth round of Botox injections related to migraines. (R. 476-77). She reported her previous injection was "mildly helpful." (R. 477). She also reported taking Aleve and Maxalt, which were "helpful." (*Id*.) Dr. Diethelm found Plaintiff was awake, was alert without any focal motor or sensory deficits, and had a steady gait. (R. 476). Dr. Diethelm noted he would adjust Plaintiff's medication, and if the medication was not effective she should return in six weeks for consideration of Botox. (R. 477).

Later in July 2015, Plaintiff saw Chad Knight, LCSW, for counseling. (R. 487). Knight noted Plaintiff reported that she stopped taking her anxiety medication for "some reason she could not completely explain." (R. 488). Plaintiff mentioned that she was a full-time caregiver for her mother who had a stroke recently, and that she recently had spent four days at the beach with a

friend. (*Id*.) Knight noted that Plaintiff was anxious, had a hyper mood, and her affect was somewhat detached/animate. (R. 489). She was cooperative. (*Id*.)

Plaintiff presented on July 28, 2015, at the emergency room after falling and breaking her right ankle. (R. 536). She denied psychiatric symptoms. (*Id*.) She was alert, fully oriented, and had no focal neurological deficits. (R. 537). She was cooperative, had appropriate mood and affect, and normal judgment. (*Id*.)

In August 2015, Plaintiff presented to Christopher Kelley, M.D., for follow-up related to her right ankle surgery. (R. 465-66). Dr. Kelley found Plaintiff was in no acute distress and she was alert, cooperative, and oriented to person, place, and time. (R. 466). She also had normal coordination, gait, and posture. (*Id*.)

Later in August 2015, Plaintiff saw Knight for counseling. (R. 490). She mentioned that she fell and broke her ankle after their last session, and she was stuck in her house without anything to do. (*Id*.) She indicated she had not done her relaxation and stress relief techniques. (R. 490-91). Knight noted Plaintiff was in a "very good mood" because she said she was finally able to get out of the house. (R. 490). Knight noted Plaintiff was alert and fully oriented with no disturbances. (R. 492). Her mood was good, her affect was full, and she was cooperative. (*Id*.)

At the end of August 2015, Plaintiff saw Dr. Diethelm and received a sixth round of Botox injections. (R. 478). Dr. Diethelm found Plaintiff was awake and alert without any focal motor or sensory deficits, and she had a steady gait. (*Id*.) She was to return in six weeks for Dr. Diethelm to assess her improvement. (*Id*.)

Plaintiff also saw Nurse Doty in August 2015, and he found she had normal extremities; normal memory; and intact cranial nerves. (R. 497). She was fully oriented; had appropriate mood and affect; normal insight; and normal judgment. (*Id*.) Doty diagnosed Plaintiff with chronic anxiety and adjusted her medication. (*Id*.)

In September 2015, Plaintiff saw Knight, who noted Plaintiff was not complaining of stress and reported her medication increase was helpful. (R. 499). He indicated Plaintiff had a good mood, was less anxious, and had an affect congruent with her mood. (*Id*.) She had less pressure and normal speech. (*Id*.) She was "much calmer." (*Id*.) Knight noted Plaintiff was "responding well to therapy and medication." (R. 500). She was alert, was fully oriented without disturbances, and her condition was "improved." (R. 501).

In October 2015, Plaintiff saw Dr. Diethelm for a follow-up related to her migraines. (R. 577). Dr. Diethelm found Plaintiff was awake and alert without any focal motor or sensory deficits, and had a steady gait. (*Id*.) He noted a

frequency-to-severity ratio of 18:12.  (*Id*.)  She received medication refills and was

to return in 6 weeks for Dr. Diethelm to administer Botox.  (*Id*.)

In December 2015, Plaintiff saw Dr. David Wilson for a psychological

evaluation on referral from her attorney.  (R. 570-74).  Plaintiff mentioned that she

had been in a relationship for three years and she saw her boyfriend "regularly."

(R. 571).  Plaintiff drove herself to the appointment (R. 572).  Dr. Wilson noted

Plaintiff had neat hygiene and appearance.  (*Id*.)  She had intact thought processes,

although she was not good with and slow in giving dates and details.  (*Id*.)  She

had clear speech with a normal rate and was cooperative and respectful throughout

the examination.  (*Id*.)  She denied hallucinations, delusions, ideas of reference,

and phobias, but Dr. Wilson noted that she might have obsessions or compulsions.

(*Id*.)  Plaintiff indicated she was having panic attacks a couple of times a month.

(*Id*.)  Dr. Wilson opined that Plaintiff had "adequate mental control and attention,"

although she had "problems with short term memory and working memory."  (R.

573).  Her "self-report" inventory showed significant levels of anxiety and

depression.  (*Id*.)  In a summary, Dr. Wilson noted that Plaintiff reported her

physician took her out of work because of migraines, that she still had migraines,

and that Plaintiff "indicated she cannot function at all when she has them."  (R.

574).  Dr. Wilson noted that she was experiencing "clinically significant levels of

depression and anxiety . . . [, and] she did show difficulty retrieving information, and thinking clearly [during the evaluation] and these issues would cause problems in a work environment." (*Id*.) Dr. Wilson stated that Plaintiff's "ability to withstand pressures of day to day occupational functioning is highly impaired." (*Id*.) Dr. Wilson further indicated it was not "likely her status will improve in the next 12 months." (*Id*.) Dr. Wilson diagnosed Plaintiff with major depressive disorder, recurrent (moderate); disorder, not otherwise specified (with some obsessive compulsive tendencies, and difficulty focusing); estimated low average to borderline intelligence; arthritis; recent ankle break; and chronic, frequent migraines. (*Id*.) In a "Mental Health Source Statement," Dr. Wilson indicated Plaintiff could understand, remember and carry out very short and simple instructions "[a]s long as she is not having a migraine." (R. 575). However, she could not maintain attention, concentration, or pace for at least two hours; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; accept instructions and respond appropriately to criticism from supervisors; or maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (*Id*.) He concluded that in a 30 day period, Plaintiff would fail to report to work 28 days due to psychological symptoms. (*Id*.) The limitations,

according to Dr. Wilson, existed back to June 10, 2012. (*Id*.) Dr. Wilson stated Plaintiff's medication caused sedation that she said "knocks me out." (*Id*.)

In December 2015, Dr. Diethelm opined in a check-box form provided by Plaintiff that Plaintiff could stand for four hours at one time, stand for two hours at one time, and walk for two hours at one time. (R. 576). She was expected to be lying down, sleeping, or sitting with her legs propped at waist level or above for two hours in an eight-hour daytime period. (*Id*.) Her limitations existed back to June 20, 2012, and they were expected to last 12 or more months. (*Id*.) Dr. Diethelm indicated that Plaintiff's chronic migraines caused limitations and when "severe" they were "debilitating." (*Id*.) He said the side effects of Plaintiff's medications were "drowsiness and sedation." (*Id*.)

At the end of December 2015, Plaintiff saw Dr. Diethelm and received an seventh round of Botox injections. (R. 578). Dr. Diethelm found Plaintiff was awake, was alert without any focal motor or sensory deficits, and had a steady gait. (*Id*.) She was to return in six weeks for Dr. Diethelm to assess her improvement. (*Id*.)

**B.      Medical Opinions of Dr. Diethelm**

Plaintiff initially argues that the ALJ did not accord proper weight to the opinions of Dr. Diethelm as her treating physician. (Doc. 12 at 25). As part of

this claim, she asserts the ALJ failed to state specific reasons for rejecting Dr. Diethelm's opinions. (*Id*.) The Commissioner responds that the ALJ properly evaluated his opinions. (Doc. 14 at 20).

As noted above, Plaintiff bears the burden of proving that she is disabled within the meaning of the Social Security Act. *See* 20 C.F.R. § 416.920(a); *Moore,* 405 F.3d at 1211; *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001). Specifically, Plaintiff must provide evidence of an underlying medical condition and either objective medical evidence confirming the severity of the alleged symptoms or that the medical condition could be reasonably expected to give rise to the alleged symptoms. *See* 20 C.F.R. § 419.929(a); *Dyer v. Barnhart*, 359 F.3d 1206, 1210 (11th Cir. 2005); *Wilson*, 284 F.3d at 1225-26; *Edwards v. Sullivan*, 937 F.2d 580, 584 (11th Cir. 1991). In analyzing the evidence, the focus is on how an impairment affects Plaintiff's ability to work, and not on the impairment itself. *See* 20 C.F.R. § 416.929(c)(1); *McCruter v. Bowen*, 791 F.2d 1544, 1547 (11th Cir. 1986) (severity of impairments must be measured in terms of their effect on the ability to work, not from purely medical standards of bodily perfection or normality).

When determining the weight to be given an acceptable medical source such as a physician, an ALJ is to consider numerous factors, including whether the

physician examined the individual, whether the physician treated the individual, the evidence the physician presents to support his or her opinion, whether the physician's opinion is consistent with the record as a whole, and the physician's specialty. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c). A treating physician's opinion generally is entitled to more weight, and an ALJ must give good reasons for discounting a treating physician's opinion. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011). This is particularly true when the treatment "has been over a considerable period of time." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). "However, the nature of the relationship between the doctor and the claimant is only one factor used to determine the weight given to a medical opinion." *Chambers v. Astrue*, No. 1:11-cv-02412-TWT-RGV, 2013 WL 486307, at *27 (N.D. Ga. Jan. 11, 2013) (citing 20 C.F.R. § 404.1527). An ALJ may discount a physician's opinion, including a treating physician's opinion, when the opinion is conclusory, the physician fails to provide objective medical evidence to support his or her opinion, the opinion is inconsistent with the record as a whole, or the evidence otherwise supports a contrary finding. *See* 20 C.F.R. §§ 404.1527(c)(3), (c)(4), 416.927(c)(3), (c)(4); *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1159-60 (11th Cir. 2004); *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir.

2004).

Plaintiff notes that Dr. Diethelm presented two opinion statements: (1) a February 10, 2014, letter wherein he states that she suffers from chronic migraines, which preclude employment (R. 356) and (2) a Physical Capacities Form dated December 6, 2015, wherein he states that he expects Plaintiff "to be lying down, sleeping sitting with [her] leg propped at waist level or above for 2 hours due to her medical conditions...." (R. 576). The ALJ stated that he assigned only partial weight to Dr. Diethelm's opinions because his opinions regarding Plaintiff's "exertional limitations are not supported by his examination notes or the notes of any other treating physician. Further, he stated that [Plaintiff's] medications cause drowsiness and sedation, but his examination notes reveal no such complaints." (R. 29).

In support of Dr. Diethelm's opinions, Plaintiff argues (1) Dr. Diethelm has treated her at least 25 times during the relevant period; (2) only once did he find that she had less than four "'disabling' days of migraines per month"; (3) he changed her medication five times before administering Botox injections; (4) he noted that on most migraine days, she had to lie down because medication did not relieve her headaches; and (5) he evaluated her before and after her Botox treatments over an 18-month period. (Doc. 12 at 26-27). The Commissioner

counters that the ALJ properly gave "partial weight" to Dr. Diethelm's opinions because (1) his treatment notes, nor those of any other treating physician, do not support his opinions regarding Plaintiff's exertional limitations; (2) Plaintiff improved following her Botox injections; (3) Plaintiff was not compliant with her medication, and she refused to complete patient assistance forms that would allow her to receive needed medication; (4) his treatment notes do not show drowsiness and sedation were an issue; (5) he relied heavily upon Plaintiff's subjective complaints; and (6) his opinion that Plaintiff is disabled is one reserved for the Commissioner and not entitled to special significance or evaluation. (Doc. 14 at 21-23).

The court makes a number of findings on this issue. First, Dr. Diethelm does have an extensive longitudinal history with Plaintiff. Second, his treatment notes and records do not support the exertional limits opined in the Physical Capacities Form. In particular, the court finds that there is no indication in his records, or elsewhere, that Plaintiff would need to lay down, sleep, or sit with her legs propped-up at waist level or above for at least two hours in an eight hour work day. Third, while his treatment notes do not reference "drowsiness or sedation," the side effects of many of Plaintiff's medications include tiredness and

drowsiness.[7]  Fourth, Plaintiff's last reported frequency-to-severity ratio

concerning the migraines was three months before the ALJ's decision.  Her

reported ratio was listed on October 15, 2015, after numerous Botox injections, as

18:12.  (R. 577).  While this does not suggest the injections were particularly

effective, the reported ratio is based on Plaintiff's reporting.  And, that is one of

the items the ALJ was critical of in his opinion.  Fifth, Plaintiff was non-compliant

with her medications.  She attributes this to financial difficulties.  However, as

correctly pointed out by the ALJ, Plaintiff unexplainedly refused to complete the

financial assistance forms.  (R. 428).  This fact adds credence to the ALJ's

assessment that Plaintiff's "statements regarding the intensity, persistence, and

limiting effects of her symptoms are not entirely credible."  (R. 28).  The court

also notes that on May 21, 2014, six weeks after her first Botox injection, when

Plaintiff was reporting that she was experiencing 25 disabling migraines per

---

[7]*See , e.g.,*
https://www.webmd.com/drugs/2/drug-1807/elavil-oral/details;
https://www.webmd.com/drugs/2/drug-32543-89/trazodone-oral/trazodone-oral/de
tails; https://www.webmd.com/drugs/2/drug-8440/maxalt-oral/details;
https://www.webmd.com/multiple-sclerosis/qa/what-are-side-effects-of-zofran-or-
reglan-used-to-treat-nausea-associated-with-cytoxan;
https://www.webmd.com/drugs/2/drug-920-6006/klonopin-oral/clonazepam-oral/d
etails;
https://www.webmd.com/drugs/2/drug-8603/celexa-oral/details; and
https://www.webmd.com/drugs/2/drug-12065/cetirizine-oral/details.

month, Dr. Diethelm noted that "[s]he is non-complaint with most medications and does not treat her headaches." (R. 430). Again, this tends to indicate her reports concerning her symptoms are not entirely credible. (R. 28). Sixth, Dr. Diethelm's notes reflect that Plaintiff's migraines improved or likely would improve with continued injections. (R. 426, 428). Seventh, Dr. Diethelm's opinion that Plaintiff was disabled due to migraines is not a medical opinion. It is an opinion on an issue specifically reserved to the Commissioner. *Denomme v. Comm'r, Soc. Sec. Admin.*, 518 F. App'x 875, 877-78 (11th Cir. 2013). Accordingly, Dr. Diethelm's opinion on this issue is not entitled to any deference. *Id*.

In sum, the court finds that the record constitutes a mixed bag. It evidences Plaintiff's complaints of chronic migraines, but it also supports the ALJ's finding that Plaintiff is not as limited as she alleges and his RFC determination that she can perform light work with various limitations. Accordingly, the court finds that Plaintiff's challenges do not adequately refute the ALJ's determination that Dr. Diethelm's opinion is entitled to partial weight.[8]

---

[8]Because of the court's determination on this issue, it need not address Plaintiff's argument that *MacGregor v. Bowen*, 728 F. 2d 1050 (11th Cir. 1986), mandates that "[w]here the Commissioner ignores or fails to properly refute the treating physician's opinion, it will be accepted as true as a matter of law." (Doc. 12 at 29).

### C.    Opinions of Examining Psychologist Dr. Wilson and Treating Counselor Harvey

Plaintiff argues that the ALJ improperly afforded only partial weight to treating counselor Harvey and examining psychologist Dr. Wilson and that he incorrectly substituted his judgment for their opinions.  (Doc. 12 at 29-34). Plaintiff further argues that the ALJ failed "to state with at least some measure of clarity the grounds for his decision."  (Doc. 12 at 31-32 (citing *McClurkin v. Soc. Sec. Admin.*, 625 F. App'x 960 (11th Cir. 2015) and *Winsschel v. Comm'r Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011))).  The Commissioner argues that the ALJ properly evaluated their opinions.

To place this argument in context, it is important to note that Dr. Wilson's opinion is a medical one, while Harvey's is not a medical opinion under the regulations.  Additionally, it should be noted that the ALJ accepted a portion of both of their opinions.  He found that both individuals reasonably opined that Plaintiff was able to work with simple instructions, which was consistent with their objective findings and the medical evidence of record.  (R. 29).  *See* 20 C.F.R. § 416.927(c)(3).  He did find, however, that the remainder of their opinions were "grossly inconsistent with their evaluation notes and objective findings."  (R. 29).  Each opinion will be addressed below.

1.    **Dr. Wilson**

The ALJ summarized Dr. Wilson's one-time evaluation with Plaintiff as

follows:

> Dr. Wilson noted the claimant's reports of anxiety and depression, for
> which she was attending therapy and taking Prozac. She indicated
> that treatment was helpful. She complained of panic attacks
> occurring a couple of times per month. She stated that she was not
> taking medication for ADHD. The claimant reported that she had
> been caring for her mother since a stroke in June, and [she] had been
> in a relationship for three years. She indicated that they got along
> well and enjoyed playing darts. As for her daily activities, the
> claimant acknowledged that she was able to take her daughter to
> school, prepare meals for her mother, and sometimes help with
> laundry. She stated that she had taken a trip to the beach a couple of
> weeks earlier. Dr. Wilson observed that the claimant drove herself to
> the evaluation, arriving early. Her thought process was intact, but she
> was reportedly slow in providing dates and details. She was
> emotional and upset about having to rely on others, but her affect was
> within normal limits. The claimant was cooperative and respectful.
> Upon mental status examination, she was able to count backwards
> from 20, making one error that she corrected. She could perform
> serial threes but could not count backwards from 100 by sevens. She
> could perform simple math and more complex calculations, and she
> exhibited adequate mental control and concentration. Dr. Wilson
> remarked that the claimant displayed difficulty with short term and
> working memory. He offered diagnoses of major depressive disorder
> and anxiety disorder.

(R. 27-28). Completing a Mental Health Source Statement, Dr. Wilson stated:

1.    Claimant can (as long as she is not having a migraine)
      understand, remember or carry out very short/ simple
      instructions.
2.    Claimant cannot maintain attention, concentration and/or pace for
      periods of at least 2 hours.

3. Claimant cannot perform activities w/in a schedule/ be punctual w/in customary tolerances.
4. Claimant cannot sustain an ordinary routine w/out special supervision.
5. Claimant cannot adjust to routine/infrequent work changes.
6. Claimant cannot respond appropriately to criticism from supervisors.
7. Claimant cannot interact appropriately w/ co-workers.
8. Claimant cannot maintain socially appropriate behavior/ adhere to basic standards of neatness/ cleanliness.
9. In a 30 day period, would expect claimant to fail to report to work 28 days due to her psychological symptoms.
10. These limitations have existed back to 6/20/12.
11. Side effects of med[ication]s are sedation [and] "knocks me out."

(Doc. 12 at 22 (citing R. 575)).  Evaluating Dr. Wilson's opinion, the ALJ stated:

At the [administrative] hearing, the claimant alleged that she experiences multiple panic attacks per day and 10 to 20 per week.  Dr. Wilson, the attorney-referred examining psychologist, noted her reports of two panic attacks per month, but there is no evidence that the claimant has reported panic attacks to her treating sources (Exhibits 4F, 8F, 16F, and 18F).  Notably, although Dr. Wilson diagnosed the claimant with major depression, none of the claimant's treating social workers have observed clinical evidence supporting a diagnosis of this condition (Exhibits 4F, 8F, and 16F).

(R. 28).  Additionally, the ALJ stated, as noted above, that beyond the opinions that Plaintiff can handle simple instructions and tasks, Dr. Wilson's opinions are "grossly inconsistent" with his evaluation notes and objective findings.  (R. 29).

The court agrees with the ALJ's assessment of Dr. Wilson's opinions – they are contradicted by his findings and the remainder of the record.  For instance, during her evaluation with Dr. Wilson, Plaintiff noted she got along well with her

family, she was involved in a relationship for three years and they do well together, she drove to the examination, and she stated she goes on trips. (R. 570-73). Dr. Wilson also noted that she had neat hygiene and appearance, had intact thought processes, had clear speech with a normal rate, and was cooperative and respectful throughout the examination. (R. 572). He also found she had "adequate mental control and attention." (R. 573). Additionally, there is nothing in Dr. Wilson's examination or the remainder of the record that supports an opinion that Plaintiff would likely fail to report for work 28 out of 30 days each month.

Dr. Wilson was a one-time examiner and his opinions are not entitled to deference or special consideration. *See Crawford*, 363 F.3d at 1160 ("because Hartig examined Crawford on only one occasion, her opinion was not entitled to great weight"); *McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir. 1987) (stating that a doctor who examines a claimant on only one occasion is not considered a "treating physician"). Still further, Dr. Wilson's examination notes show his diagnosis of anxiety and depression and his opinion about the limitations caused by her psychological issues were based primarily on Plaintiff's self-reports. (R. 573). However, a claimant's subjective complaints cannot be the basis for a medical opinion. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c); *Crawford*, 363 F.3d at 1159-60 (noting that even a treating physician's report may be discounted if it is

wholly conclusory or not supported by objective medical evidence).

In sum, the court finds that the ALJ afforded proper weight to Dr. Wilson's opinions.

## 2. Mr. Harvey

Harvey prepared a Mental Health Source Statement on February 10, 2014, that provided as follows:

1. Plaintiff can understand, remember or carry out very short and simple instructions.
2. Plaintiff cannot maintain attention, concentration and/or pace for periods of at least two hours.
3. Plaintiff cannot perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances.
4. Plaintiff cannot sustain an ordinary routine without special supervision.
5. Plaintiff cannot accept instructions and respond appropriately to criticism from supervisors.
6. Plaintiff cannot maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness.
7. In a 30 day period, Plaintiff would be expect to fail to report to work frequently.
8. I would say Plaintiff's limitations existed back to 6/20/12.
9. There are no side effects from Plaintiff's medications as she is "[i]n constant pain."

(R. 355). In rejecting all but Harvey's first opinion, the ALJ stated the remaining opinions are "grossly inconsistent with [his] evaluation notes and objective findings." (R. 29). The court agrees.

In reviewing this claim, the court begins with the premise that as a non-

medical source, Harvey's opinion is not entitled to any special consideration or

deference. *See Farnsworth v. Soc. Sec. Admin.*, 636 F. App'x 776, 783-84 (11th

Cir. 2016) ("While the ALJ was required to consider the opinions of [licensed

mental health counselors] as other medical sources, the ALJ was not required to

give their opinions controlling weight over the opinions of acceptable medical

sources, such as [a doctor].").

The ALJ articulated Harvey's involvement with Plaintiff as follows:

Social worker Dave Harvey, CRNP, performed a psychological
evaluation on September 12, 2013.  The claimant reported significant
financial stress and frustration with her living arrangements.  She
reported that she was dating occasionally, however.  Mr. Harvey
observed that the claimant's mood was anxious with a labile affect.
She was cooperative but discouraged, and she appeared distracted.
Her behavior was unremarkable, however, and she demonstrated fair
judgment, insight, and reasoning.  Mr. Harvey advised the claimant to
exercise, watch her diet, and externalize her interests.  He offered a
diagnosis of generalized anxiety and acute stress disorder.  She
presented with a better mood at an October session, noting that she
did not feel as overwhelmed when she participated in therapy.  In
November, she stated that she was doing better.  She reported that she
was dating and had traveled to Mississippi the week before and was
leaving for Georgia later that day.  Upon mental status examination,
Mr. Harvey observed that the claimant was upbeat, but tense.  He
observed symptoms of attention deficit hyperactivity disorder
(ADHD), and he advised her to talk to her neurologist about this.

At encounters in 2014, the claimant presented as oriented, with an
appropriate mood and affect (Exhibit 8F).  In February of 2015, she
was prescribed Paxil and Vistaril.  At a therapy session in April, the
claimant reported that she was still stressed and had financial
problems, but she noted that she had recently moved in with her

boyfriend (Exhibit 16F). She stated that she had not been taking Paxil or Vistaril secondary to cost. Mr. Harvey observed that the claimant was in a better mood, but with impaired ability to make reasonable decisions. He indicated that he would continue to work with her on stress reduction. In May, the claimant reported that she had been trying to relax by painting and taking walks. She appeared tense and uptight, but her mental status was otherwise normal. She apparently began taking Paxil again, as her rheumatologist noted her reports of Paxil being helpful at an examination in June (Exhibit 13F)....

(R. 26-27). The ALJ is correct in that Harvey's opinion is inconsistent with his session notes. While Plaintiff evidenced issues concerning stress, she also was seen as doing better. She was dating, traveling, and planning another trip. (R. 339). Her reports and Harvey's notes do not support the extreme situation and limitations described by Harvey in the Mental Health Source Statement. For example, Harvey states in the Statement that Plaintiff cannot maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, yet his notes do not suggest, much less support, such a conclusion. Additionally, he states that in a 30 day period, Plaintiff would be expect to fail to report to work frequently. However, his notes do not support this conclusion either. Thus, the ALJ was correct in affording Harvey's Statement only partial weight.

The court notes that the Statements provided by both Wilson and Harvey were a check-a-box form with little opportunity for explanation. Such conclusory forms are disfavored because of the absence of explanation, support, or context.

*See, e.g., Florio v. Commissioner of Social Security*, 2017 WL 344188, at \*4

(M.D. Fla. Jan. 24, 2017) (explaining "the type of form questionnaire or so-called

"checklist" opinion that [the doctor] used, without providing any explanation or

context concerning the reasons for his opinion, generally is disfavored as it does

not provide the ALJ nor the Court with any basis on which to rely upon the

opinion."); *see also Kelly v. Colvin*, No. 3:16-CV-14-CJK, 2017 WL 440263, at

\*10 n.12 (N.D. Fla. Feb. 1, 2017) (explaining that even a treating physician's

opinion "on a form that does not detail evidence in the record supporting the

work-related limitations identified . . . will not bind the Commissioner") (internal

citations omitted); *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993) (stating

that "[f]orm reports in which a physician' s obligation is only to a check a box or

fill in a blank are weak evidence at best"); *O'Leary v. Schweiker*, 710 F.2d 1334,

1341 (8th Cir. 1983) (explaining "[check-box] forms are admissible, [but] they are

entitled to little weight and do not constitute 'substantial evidence' on the record

as a whole"). The court finds that the forms are not particularly supportive of

Plaintiff's position and the ALJ did not err in affording partial weight to Dr.

Wilson's and Harvey's opinions.

Finally, Plaintiff argues in conclusory fashion that the ALJ substituted his

opinion for that of Dr. Wilson and Harvey because he determined Plaintiff could

"successfully perform work activity within the parameters of the assigned residual functional capacity on a sustained basis." (Doc. 12 at 30). The court disagrees. The ALJ properly evaluated all the relevant evidence in assessing Plaintiff's RFC. (R. 24-29). *See Ybarra v. Comm'r of Soc. Sec.*, 658 F. App'x 538, 543 (11th Cir. 2016) (it is the "responsibility to resolve conflicting medical opinions"); *Beegle v. Soc. Sec. Admin., Com'r*, 482 F. App'x 483, 486 (11th Cir. 2012) ("the ALJ may reject the opinion of any physician if the evidence supports a contrary conclusion").

### D.    Listing 12.06

Plaintiff argues that the evidence supports a finding that she is disabled under Listing 12.06, concerning anxiety and obsessive-compulsive disorders. (Doc. 12 at 34-41). Specifically, she argues that she meets the criteria of Listing 12.06A and 12.06C.[9] She then cites to various medical records, without any

---

[9]Listing 12.06 provides in relevant part:

12.06 Anxiety and obsessive-compulsive disorders (see 12.00B5), satisfied by A and B, or A and C:

  A. Medical documentation of the requirements of paragraph 1, 2, or 3:

      1. Anxiety disorder, characterized by three or more of the following;

    a. Restlessness;

    b. Easily fatigued;

discussion, that purportedly support her argument.  (*Id*.)  The Commissioner

argues that Plaintiff has failed to show that she meets the requirements of Listing

12.06.  (Doc. 14 at 29- 32).

Plaintiff may establish disability if she proves her impairments meet or

equal a Listing.  *See* 20 C.F.R. § 416.920(a)(4)(iii); *Doughty v. Apfel*, 245 F.3d

---

c. Difficulty concentrating;

d. Irritability;

e. Muscle tension; or

f. Sleep disturbance.

   2. Panic disorder or agoraphobia, characterized by one or both:

   a. Panic attacks followed by a persistent concern or worry about additional
   panic attacks or their consequences; or

   b. Disproportionate fear or anxiety about at least two different situations
   (for example, using public transportation, being in a crowd, being in a line,
being outside of your home, being in open spaces).

....

   C.  Your mental disorder in this listing category is "serious and persistent;" that
is, you have a medically documented history of the existence of the disorder over
a period of at least 2 years, and there is evidence of both:

   1. Medical treatment, mental health therapy, psychosocial support(s), or a
highly structured setting(s) that is ongoing and that diminishes the symptoms and
signs of your mental disorder (see 12.00G2b); and

   2. Marginal adjustment, that is, you have minimal capacity to adapt to changes
in your environment or to demands that are not already part of your daily life (see
12.00G2c).

20 C.F.R. Ch. III, Pt. 404, Subpt. P. App. 1, § 12.06A & C.

1274, 1278 (11th Cir. 2001); *Barron v. Sullivan*, 924 F.2d 227, 229 (11th Cir. 1991). "To 'meet' a Listing, a claimant must have a diagnosis included in the Listings and must provide medical reports documenting that the conditions meet the specific criteria of the Listings and the duration requirement." *Wilson*, 284 F.3d at 1224 (citations omitted); *see* 20 C.F.R. §§ 416.925, 416.926. "For a claimant to show that [an] impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). Under Plaintiff's argument, she must show that she satisfies the criteria of Listing 12.06A and 12.06C. (*See* Doc. 12 at 34-41).

The evidence in this case shows that Plaintiff was diagnosed with anxiety. The ALJ did not evaluate her situation under Listing 12.06A, but proceeded to an evaluation under 12.06C.[10] He found that she did not satisfy the paragraph "C" criteria because she had "no episodes of decompensation," "she is able to function independently," and "there is no indication that a minimal increase in mental demands or change in the environment would be predicted to cause her to decompensate." (R. 24). This determination is supported by substantial evidence.

The record is replete with evidence that plaintiff is able to function

---

[10]Plaintiff does not argue that she meets the criteria of Listing 12.06B. Accordingly, the only issue is whether the ALJ properly applied Listing 12.06C.

independently and that mental or environmental changes would not cause her to decompensate. By way of example, Plaintiff went to the beach with a friend for four days in July 2015 (R. 488); she tries to get out of the house every day, even if it only for a few minutes (R. 183); she shops in the stores for "food & basic necessities" (*id.*); she dates and sees her boyfriend "regularly" (R. 339, 571); she went to Biloxi, Mississippi with her son, her boyfriend, and her boyfriend's son (R. 339); she drives to appointments (R. 572); and she takes her daughter to school (R. 573). Thus, Plaintiff does not meet the requirements of 12.06C. The citations in her briefs do not support her argument that she meets the 12.06 listing. The court concludes this claim is without merit.

### E. Plaintiff's Subjective Complaints

Plaintiff next argues that the ALJ did not provide adequate reasons for finding her not credible. (Doc. 12 at 41-46). In support of this argument, she cites to her hearing testimony and offers no supporting argument in her initial or reply brief other than to say that the vocational expert testified that if Plaintiff's testimony is credible and supported by the evidence, then there are no jobs she can perform. (*Id.* & Doc. 15 at 10-11).

In addressing Plaintiff's subjective description of her symptoms, the law is clear:

In order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain. *See Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). If the ALJ discredits subjective testimony, he must articulate explicit and adequate reasons for doing so. *See Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987). Failure to articulate the reasons for discrediting subjective testimony requires, as a matter of law, that the testimony be accepted as true. *See Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

*Wilson*, 284 F.3d at 1225; *see also* 20 C.F.R. §§ 416.929. In determining whether substantial evidence supports an ALJ's credibility determination, "[t]he question is not . . . whether the ALJ could have reasonably credited [the claimant's] testimony, but whether the ALJ was clearly wrong to discredit it." *Werner v. Comm'r of Soc. Sec.*, 421 F. App'x 935, 939 (11th Cir. 2011).

When evaluating a claimant's statements regarding the intensity, persistence, or limiting effects of her symptoms, the ALJ considers all the evidence – objective and subjective. *See* 20 C.F.R. § 416.929(c)(2). A plaintiff cannot simply allege disabling symptoms. *See* 20 C.F.R. § 416.929(a) ("statements about your pain and other symptoms will not alone establish that you are disabled"). The ALJ may consider the nature of a claimant's symptoms, the effectiveness of medication, a claimant's method of treatment, a claimant's

activities, measures a claimant takes to relieve symptoms, and any conflicts between a claimant's statements and the rest of the evidence. *See* 20 C.F.R. § 416.929(c)(3), (4). The ALJ is not required explicitly to conduct a symptom analysis, but the reasons for his or her findings must be clear enough that they are obvious to a reviewing court. *See Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995). "A clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court." *Id.* (citation omitted).

The ALJ summarized Plaintiff's testimony as follows:

At the hearing, the claimant testified about her condition. Through her representative, she alleged that she is unable to work due to headaches, anxiety, joint pain, and a fractured ankle. The claimant complained that she experiences headaches at random intervals despite medication. She described some of her headaches as mild, characterizing the pain level as ranging from five to seven on a ten-point scale. She also described severe headaches with a pain level of ten, and she alleged that she experiences headaches of this severity about half of the days of a month. During such a headache, the claimant stated that she will take Maxalt, which reportedly causes sedation, and she will lie down in a dark room. She also reported that she has anxiety and experiences several panic attacks each day, or about 10 to 20 each week. She indicated that these panic attacks are triggered by stress, and she feels jittery and drained after an attack. She complained of difficulty focusing, remarking that she would not be able to concentrate on a two-hour movie. Regarding her reports of joint pain in her hands, the claimant complained that her pain is worse

in the morning, with normal functioning returning after lunchtime. Prior to that time, she alleged that she is unable to turn a doorknob.

As for her activities of daily living, the claimant stated that she has partial custody of her daughter but otherwise lives alone. She has a current driver's license, but she reported that she only drives when necessary because the light shining through trees intensifies her migraines. She reported that she sits around during the day and does not engage in any hobbies, although she later indicated that she occasionally draws. The claimant noted that she was learning how to play darts prior to breaking her ankle. She related that she can sometimes perform housework. She noted that in the mornings, she checks on her mother who lives on the same property.

(R. 25). In finding that Plaintiff's statements concerning her symptoms are not entirely credible, the ALJ based his decision on a number of items or inconsistencies in the record.

First, he explained that Plaintiff was "noncomplaint with her prescribed treatments, reportedly secondary to cost, and she has reported that she just 'deals with' her headaches." (R. 28). He noted, however, that the medical providers documented that she refused to apply for patient financial assistance, "which undermines her allegations of severe, disabling chronic migraines." (*Id*.) Second, he stated that while Plaintiff minimized her activity level at the hearing, "she is capable of caring for her mother and children, and she has dated and gone on several trips during the relevant period." (*Id*.) Third, he stated that Plaintiff's subjective complains of hand and knee difficulties were inconsistent with other evidence in the record. (*Id*.) Then noted that she stated in her Function report that "walking doesn't bother me." (R. 28, 185). Fourth, he stated that Plaintiff was

noncompliant with her relaxation and stress relief techniques for her psychological symptoms that were recommended by medical providers.  (R. 28).  Plaintiff stated to her social worker that she did not do the techniques because she did not have time for them.  (R. 487).  This tends to undermine her complaints of debilitating symptoms when there are no costs other than time associated with the activity.

Fifth, the ALJ stated that Plaintiff alleged that she experiences multiple panic attacks per day and at least 10-20 per week.  (R. 28, 48).  Disputing Plaintiff's testimony is  Dr. Wilson's report in his Psychological Evaluation that Plaintiff informed him that she was having only two or three attacks per month.  (R. 572).  Additionally, Plaintiff did not report to her treatment providers that she was experiencing panic attacks.  (R. 28).  Lastly, the court also notes that Plaintiff's activities of daily living that have been discussed herein are not consistent with her purported symptoms and limitations.

Plaintiff's conclusory arguments and citations to hearing testimony is insufficient.  The ALJ properly evaluated all the evidence and explained his reasoning in finding that Plaintiff's reporting was not reliable.  His decision on that matter is supported by substantial evidence.  Plaintiff is entitled to no relief on this claim.

## F.     Vocational Expert Testimony

Plaintiff next argues that the ALJ's decision is not based on substantial evidence because the hypothetical question posed to the VE that was relied upon by the ALJ did not include all of her impairments and limitations.  (Doc. 12 at 46-48; Doc. 15 at 11-12).  Plaintiff is not specific as to what impairments or limitations were not included.  It does appear from a broad reading of her briefs that the items left out concern her migraine headaches, depression, and anxiety.  (R. 46).  The Commissioner argues that the ALJ properly evaluated the testimony and formulated an appropriate hypothetical question for the VE.  (Doc. 14 at 36-37).

The ALJ formulated the hypothetical question that he relied upon premised on his determination of Plaintiff's limitations expressed in the RFC.  (R. 53-54).  The VE testified that such a person could not perform Plaintiff's past work, but the person could perform other jobs that existed in significant numbers in the national economy.  (R. 54).  To the extent Plaintiff argues that the ALJ should have relied upon the alternative hypotheticals that included other limitations, including those articulated by Dr. Diethelm, Dr. Wilson, and Harvey, the court disagrees.

"In order for a VE's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's

impairments." *Jones v. Apfel*, 190 F.3d 1224, 1229 (11th Cir. 1999). Stated differently, "[i]f the ALJ presents the vocational expert with incomplete hypothetical questions, the vocational expert's testimony will not constitute substantial evidence." *Jacobs v. Comm'r of Soc. Sec.*, 520 F. App'x 948, 950 (11th Cir. 2013) (citing *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180-81 (11th Cir. 2011)). Additionally, the ALJ is not required to include findings in the hypothetical that the ALJ had properly rejected as unsupported. *See Crawford*, 363 F.3d at 1161, *see also Yates v. Comm'r of Soc. Sec.*, 706 F. App'x 588, 594 (11th Cir. 2017) ("the ALJ did not err by failing to include Yates's migraines in the hypothetical question" when he "did not find that the medical evidence supported Yates's assertions of completely disabling pain related to her migraines and thus to any corresponding limitations").

As stated above, after considering all the evidence, including the opinions of Drs. Diethelm and Wilson and Mr. Harvey, he assigned partial weight to them. In doing so, the ALJ included only a portion of their opinions in his RFC finding. Accordingly, he then framed the hypothetical in a manner consistent with his RFC finding. This is what he is required to do. Substantial evidence supports the ALJ's RFC finding, thereby justifying his reliance on the hypothetical posed to the VE. Plaintiff has not demonstrated that he erred in doing so. This claim,

therefore, is without merit.

## G.    Plaintiff's RFC

Plaintiff's last argument is that the ALJ erroneously determined that she could perform light work. Specifically, she argues the RFC is conclusory and violates SSR 96-8p. (Doc. 12 at 48-52). The Commissioner disagrees. (Doc. 14 at 37-39).

Determining Plaintiff's ability to work "is within the province of the ALJ, not a doctor." *Cooper v. Astrue*, 373 F. App'x 961, 962 (11th Cir. 2010). The relevant question is whether there is substantial evidence to support the ALJ's RFC determination. *Castle v. Colvin*, 557 F. App'x 849, 853 (11th Cir. 2014).

Here, after considering all the evidence and allowing for Plaintiff's limitations associated with her impairments, the ALJ limited her "to the light exertional level" with additional restrictions. (R. 28-29). Light work is defined as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for

long periods of time.

20 C.F.R. § 404.1567(b). Plaintiff's Physical Residual Functional Capacity Assessment determined that she could occasionally lift and/or carry 50 pounds at a time and could frequently lift and/or carry 25 pounds. (R. 65). Nothing in the record or offered by Plaintiff indicates otherwise. Thus, this aspect of her final claim is without merit.

To the extent that Plaintiff argues the ALJ violated SSR 96-8p because "the RFC assessment is simply conclusory and does not contain any rationale or reference to the supporting evidence," the court disagrees. (Doc. 12 at 49). The commentary to SSR 96-8p provides, in pertinent part:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

SSR 96-08p, 1996 WL 374184, *7. Additionally, the ALJ must "consider and address medical source opinions." *Id*. The analysis should include "a discussion of why reported symptom-related functional limitations and restrictions can or

cannot reasonably be accepted as consistent with the medical and other evidence." *Id.* The "RFC assessment must always consider and address medical source opinions," and in cases where the assessment conflicts with an opinion from a medical source, the ALJ "must explain why the opinion was not adopted." *Id.*

The ALJ's RFC finding in this case is detailed and premised on a focused evaluation of Plaintiff's symptoms and limitations, the medical records, and the other evidence of record. He also provided explanations concerning the limitations imposed in light of her determined impairments. (R. 28-19). Plaintiff has not demonstrated what the ALJ has failed to do. With regard to her migraine headaches, the ALJ specifically limited her work to positions avoiding "extreme temperatures, vibration, and noise." (R. 29). Regarding her mental impairments, he limited her to work involving "simple instructions"; "simple, routine, repetitive tasks"; "only occasional contact with the public"; and "workplace changes should be occasional, well explained, and introduced gradually." (*Id*.) Further limitations were not required because the ALJ did not find her symptoms necessitated such.

As previously discussed, the ALJ fully considered and evaluated the record evidence and correctly found that some of Plaintiff's purported symptoms and resulting limitations were not fully supported by the record.

## VI.  CONCLUSION

For the reasons set forth above, the undersigned concludes that the decision of the Commissioner is due to be affirmed.  An appropriate order will be entered separately.

**DONE,** this the 5th day of July, 2018.

_____
**JOHN E. OTT**
Chief United States Magistrate Judge